**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
K.H.,

                              Plaintiff,

            - against -

VINCENT SMITH SCHOOL, et al.,

                              Defendants.

----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV 06-0319 (ERK) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

        Plaintiff K.H., acting on behalf of her minor son K.C.,[1] seeks a preliminary injunction

requiring defendant Vincent Smith School (the "School") to reinstate K.C. as a student and

enjoining it from further excluding K.C. "unless and until all reasonable efforts to accommodate

his disability have been accommodated."  Docket Entry ("DE") 1 (Order to Show Cause).  She

asserts that she is entitled to such relief based on the claims she raised under three separate

federal statutes:  the Americans with Disabilities Act, 42 U.S.C. § 12182 *et seq*. ("ADA"); the

Rehabilitation Act, 29 U.S.C. § 794 *et seq*.; and the Individuals with Disability Education Act,

20 U.S.C. § 1400 *et seq*. ("IDEA").  On February 14, 2006, the Honorable Edward R. Korman,

Chief United States District Judge, referred the matter to me for a report and recommendation.

DE 2.  Following hearings on February 28 and March 14, 2006, I now make my report and, for

the reasons explained below, respectfully recommend that the court deny the plaintiff's request

for a preliminary injunction.

--------------------------------

[1]  Pursuant to this court's Administrative Order 2004-09, I refer to the plaintiff and her son only
by their initials.  The defendants have properly done likewise in their filings, and they and I
endeavored to do so during court appearances in this case.  However, neither K.H. herself nor
her counsel have made any consistent efforts to protect K.C.'s identity.  As a result, the case
caption and several docketed filings refer to the child and his mother by their full names.  I
therefore respectfully request that the Clerk seal docket entries 1, 2, and 6-8 and replace the
names of the plaintiff and her son with their respective initials in the caption of this case.

I.     Background

K.C. is a 12-year-old boy, most recently enrolled in the seventh grade, who has a learning disability that affects his ability to reason and understand written language.  DE 1 at 4.  His treating psychiatrist, Dr. Jonathan Aronowitz, has diagnosed K.C. as suffering from "Learning Disorders, Attention Deficit Hyperactivity Disorder ["ADHD"], and Mixed Receptive-Expressive Language Disorder."  DE 6 (Hearing Exhibit 1); *see also* DE 1, attached Psychological Evaluation at 4 (finding K.C. to have reading skills in the "low average range," math skills on a "2.4 grade level," written skills "significantly below average," and "a poor ability to [orally] express ideas and thoughts").  K.C. began attending the School in September 2005 as a student in its seventh grade class.  *See* DE 1 at 3; *see also* DE 4 at 5.  He remained there until his expulsion four months later, the circumstances of which are discussed in greater detail below.  Despite the brief and stormy nature of K.C.'s tenure at the School, his mother K.H. seeks to have him reinstated there because she believes "[t]his is the first school that this child has done well at[.]"  K.H. believes that the small size of the School's classes allows teachers to address K.C.'s learning needs, and she contends that K.C. "can't fit" in a public school setting. DE 7 (transcript dated Feb. 28, 2006) ("2/28 Tr.") at 14; DE 8 (transcript dated Mar. 14, 2006) ("3/14 Tr.") at 92.

The Vincent Smith School is a private school accredited by the New York Department of Education.  As part of its program, it provides instruction for children with learning disabilities, although it is not (and apparently need not be) specifically accredited for that purpose.  *See* DE 3 ¶ 3; 2/28 Tr. at 8.  Although the school aspires "to provide a small supportive educational setting for reluctant learners with special education needs[,]" DE 1 (attachment reprinting "Mission Statement" from the School's Internet web site), its headmaster defendant Arlene Wishnew

("Wishnew") testified that the School's educational program does not include a therapeutic component. 3/14 Tr. at 29. Indeed, the School's published admissions policy specifies that "[s]tudents with serious emotional or disciplinary problems will not be considered." DE 1 (attachment from School's Internet web site).[2]

Like all other parents of the School's students, K.H. executed a contract with the School obliging her to pay tuition. *See* DE 2 (attached Enrollment Contract). Both K.H. and K.C. also signed, as the School required them to do upon K.C.'s admission, an agreement to be bound by certain School policies, including the following: "No student under the jurisdiction or control of Vincent Smith School is permitted to continually engage in disruptive behavior or negative conduct which materially affects the rights of personnel to carry on their functions in the school, or affects the rights of other students to learn in an appropriately controlled educational environment." *Id*. (attached Statement of Policy). The policy statement provides that violation of the latter provision subjects a student to "sanctions including possible expulsion, at the discretion of the Head of School." *Id*.

K.C.'s disciplinary problems at the school began shortly after his enrolment and continued until his expulsion. In her affidavit in opposition to the instant motion, headmaster Wishnew wrote:

> 13.     [K.C.] engaged in a pattern of negative behavior including, but not limited to, throwing objects at Vincent Smith staff and other students, engaging in disrespectful conduct towards Vincent Smith staff and other students, teasing and

[2] Also, as discussed further below, it appears that although K.C. was taking medication to control his behavior, his mother did not reveal that fact to the School until after K.C. had been admitted and began having disciplinary problems; to the contrary, she made a written statement that the child did not take any medications, and did not amend that statement until, after being called in to discuss K.C.'s misbehavior, she stated her belief that the problem might be related to his failure to take the medications that had been prescribed for him. *See* Wishnew Aff. ¶ 15; 3/14 Tr. at 10; *id*. at 51 (Aronowitz).

otherwise harassing Vincent Smith students, engaging in physical and verbal altercations with other Vincent Smith students, lying to Vincent Smith staff, ignoring directions given to him by Vincent Smith staff, arguing with Vincent Smith staff, refusing to do classwork assigned to him by Vincent Smith staff, threatening Vincent Smith staff and other students, forcibly removing objects from the Principal's desk without permission, attempting to climb out of a window, picking up and threatening to throw a chair at the Principal of Vincent Smith. Such patterns of behavior began shortly after the commencement of the 2005-06 school year and continued until his dismissal.

14. In addition, the student frequently engaged in similarly negative behaviors during his bus ride to and from Vincent Smith from the commencement of the 2005-06 school year until his dismissal from Vincent Smith.

DE 3 ("Wishnew Aff.") ¶¶ 13-14.

The foregoing allegations tend to create an unwarranted impression that K.C.'s misbehavior was essentially unremitting from his first day at the School by blurring the timing of events – after listening to the testimony at the hearing, it appears instead that much of the above refers to the events of January 3, 2006, that triggered K.C.'s expulsion – and may also magnify, for tactical reasons, the significance of K.C.'s misbehavior as a student at the School. But even accounting for such considerations and for K.H.'s attempts to minimize in her testimony the severity and frequency of the reports of her son's behavioral problems, the record developed at the evidentiary hearing persuades me that K.C.'s behavior was a consistent, and progressively greater, problem.

Wishnew testified that from September through December of 2005, K.C.'s teachers reported behavioral problems including fits of rage and at least one incident in which K.C. allegedly put another student in a "headlock." *See* 3/14 Tr. at 8; 2/28 Tr. at 32.[3] Indeed, even the

_____

[3] K.H. disputes that she received adequate notice of K.C.'s mounting disciplinary problems. *See* 2/28 Tr. at 15. Wishnew testified, however, that after each incident on the school bus, the School sent a notice describing the incident to K.H. *See* 3/14 Tr. at 18. Although no such notices were offered or admitted in evidence, to the extent there is a factual dispute, I credit Wishnew's testimony over the somewhat less consistent statements of K.H. to the contrary.

series of teachers' reports that K.H. included in her initial motion papers suggest that K.C. had problems behaving in the classroom. Although several teachers had positive things to say about K.C.'s work, several also made comments that appear to signal classroom misbehavior: they cited K.C.'s need for better "cooperative working skills," his "negative comments while playing to other students," and his "difficulty contributing appropriately to class discussions;" and four different teachers checked a portion of the comment form indicating the need for improvement in K.C.'s "classroom behavior." DE 1 (attachment of K.C.'s "Academic Report To Parents" forms).

On November 30, 2005, the School suspended K.C. for throwing "food at a student and a soda can at a student." 3/14 Tr. at 9; *see also* 2/28 Tr. at 13. In the wake of the suspension, Wishnew met with K.H. and told her that K.C.'s status was in question. *See* 3/14 Tr. at 10. After conferring with the School's Board of Trustees, Wishnew informed K.H. that K.C.'s continued attendance at the School depended upon the outcome of a psychological observation "as soon as possible." *Id.*; *see also* 2/28 Tr. at 14.

The School chose Dr. David Dillon, a psychiatrist who works with children, to perform the observation and made an appointment for early January for Dr. Dillon to observe K.C. in the classroom, interview his teachers, and then meet with his mother. The date of the observation and interview was changed to accommodate K.H.'s schedule, and ultimately cancelled. *See* 3/14 Tr. at 9-10, 67-70, 85-88. The reason for the cancellation is in dispute: the School contends that K.H. objected to the plan to have Dr. Dillon speak with her only after the classroom observation and teacher interviews, *see id.* at 10 (testimony by Wishnew that "Dr. Dillon called me and told me he was not going to be testing K.C. because of the mother's demands and wanting to control

this interview"); K.H. says that the psychiatrist decided on his own to cancel after learning that K.C. was being treated by another psychiatrist. *Id*. at 68.

As an alternative to Dr. Dillon's evaluation, the School agreed to meet with Dr. Aronowitz to discuss K.C.'s medication – a subject that the School had not even known was a relevant issue until K.C.'s misbehavior began:

> ... We weren't aware that he was on medication when he was registered at the school. His medical records indicate that he was not on medication and then it started to come out and evolve that during one incident he was in the office, he said, "Well, I didn't take my angry medicine today."
>
> And I said, "What medicine?"
>
> And then I spoke to his mom and she says, "Well, sometimes I give him [Adderall]." I believe that was the medication.

3/14 Tr. at 10; *see also id*. at 51 (Aronowitz). Having learned of K.C.'s medication, Wishnew agreed to speak with Dr. Aronowitz about monitoring it, and K.H. said she would do the same. *See id*. at 11-12; *see also* 2/28 Tr. at 15. Wishnew testified that she spoke with Dr. Aronowitz on December 30, 2005, but recalled only that they discussed "having [K.C.'s] medication monitored" and nothing regarding having him observe K.C. at school. 3/14 Tr. at 11.

K.C. returned to the School from his suspension after approximately one week. *See* 3/14 Tr. at 23-24. On January 3, 2006, the first day of school after winter break, K.C. was again suspended in an incident that ultimately led to his expulsion and the instant litigation. *See* 3/14 Tr. at 12; 2/28 Tr. at 16-17.

On that first day of class, when K.C.'s computer class instructor asked him to take a seat in either the first or second row in the classroom, K.C. refused. 3/14 Tr. at 12. Wishnew testified that the teacher gave K.C. a choice of either sitting where he was told or going to the principal's office. *Id*. K.C. chose the latter after "screaming and cursing at the teacher." *Id*.

6

According to Wishnew (who was not at the School at the time, and relied on the hearsay statements of others), when K.C. went to the office he "picked up a chair ... and threatened to throw it at [the principal]," that he "threw things off her desk, [and] threatened to smash her computer." *Id*. at 13. K.H. (who likewise was not there) denies that K.C. picked up a chair and threatened the principal with it, instead, she contends "he just said it verbally. He never lifted the chair." 2/28 Tr. at 35. The principal called K.H. and asked that she pick K.C. up from school and informed her that K.C. was suspended until further notice. *See* 2/28 Tr. at 17.

On January 6, 2006, Wishnew met with K.H. and K.C. at the school and discussed both the events of a few days before and earlier incidents. *See* 3/14 Tr. at 13-14. Wishnew testified that she gave K.H. a "narrative" of what had occurred and that K.C. confirmed her description of his behavior. *Id*.; *see also id*. at 71 (testimony by K.H. that she was informed for the first time at the January 6 meeting that K.C. had threatened other students). K.H. disputed that K.C. admitted the conduct, but after making that denial gave testimony that suggests the dispute is more a matter of nuance and interpretation than of the underlying facts:

Q.      Ms. [H.], did K.C. admit to the misconduct?

A.      No, he did not admit to it.

Q.      Do you remember what he said?

A.      He couldn't really express, but when he was asked he said he never threw papers off [the principal's] desk. He said he verbally – but he wouldn't do anything. He said he was, you know, he said he was upset that he couldn't go back to class, he wanted to go back to class.

K.C. talks verbally, he does – it's like hot air. He couldn't hurt a fly. He's like verbal. He gets frustrated, can't express himself appropriately, and doesn't know how to talk, other than like a four or five year old who can't – you know, like doesn't have the words. He doesn't have the capacity to express himself.

> That's his problem. If he could talk appropriately, it would be the best thing. The he wouldn't get into trouble. He's his own worst enemy.
>
> Q. Did you speak with K.C. privately about what occurred?
>
> A. Yes, I spoke to him many times.
>
> Q. Did he understand the severity of his action?
>
> A. Yes, he did. He said, "Please, I want another chance." And he begged, "Please, I love the school, the school is good for me."

3/14 Tr. at 77-78. Based on this and other testimony, I conclude that regardless of whether K.C. admitted it in so many words when he and his mother met with Wishnew three days later, the incident on January 3, 2006, transpired essentially as the School contends and that the incident's basic contours were not seriously in dispute at the subsequent meeting.

At the end of the January 6 meeting, Wishnew told K.H. that she would be notified later that same afternoon as to whether K.C. would be permitted to continue attending the School. *Id*. at 14. She then conferred with the members of the School's Board of Trustees, all of whom agreed with her that K.C. should be expelled. Wishnew called K.H. that same afternoon to advise her of the expulsion, and later sent a letter to the same effect. *Id*.

Some time in the following month, K.C. attended Junior High School 190, a public school. *See* 3/14 Tr. at 73. Although the record on his brief tenure at the public school is unfortunately – and unnecessarily – murky,[4] K.H. testified that her son was suspended from that

---

[4] At the initial hearing on February 28, 2006, the School's counsel, as part of his opening statement, asserted that "there's no urgency in this matter" because he believed that K.C. was at that time "actually in another ... private school that [K.H.] can testify to." 2/28 Tr. at 11. K.H., having heard that statement, shortly thereafter testified as follows on direct examination by her attorney: "Can I just respond? He presented something which he said – My son hasn't been in school since January 6th." *Id*. at 16. When the School's counsel later inquired further on cross-examination, K.H. clearly stated that the public schools she approached following K.C.'s expulsion turned him away. *See id*. at 27-29. As revealed by the testimony at the continuation

school after only five days.  *See* 3/14 Tr. at 90-91.  K.H. described as the reason for the suspension K.C.'s verbal response to a girl who had punched him.  *See id*. at 75.  K.H. also testified that the public school "couldn't meet him educationally" because he was already too far behind.  *Id*.  As far as I can tell from the record before me, K.C. has not been permitted to return to the public school, but I am far from certain as to whether the fact that he is currently sitting at home rather than receiving an education is attributable to the school district's failure to provide a placement for the child or the mother's unwillingness to place him in a school that she alone finds deficient.  At any rate, the record does disclose that K.H. was scheduled to meet with her local school district's Committee on Special Education on March 17, 2006.  *See* 3/14 Tr. at 97. Neither side of this dispute anticipated that the meeting would result in a permanent placement for K.C., but K.H.'s counsel agreed to provide a report of the meeting's result.  Early the following week, K.H.'s counsel telephoned chambers *ex parte*, in an apparent effort to provide her report orally.  My law clerk properly instructed counsel to provide any such report in a letter on notice to opposing counsel.  As of the date of this report, however (over a week after her telephone call), counsel has inexplicably failed to submit her letter.  Accordingly, the record shows only that there was the possibility that the meeting scheduled for March 17, 2006, would result in K.C. being placed in an appropriate school and that K.H. thereafter failed to disclose whether that possibility was realized.

of the hearing on March 14, 2006, K.H.'s testimony on this subject at the initial hearing was false.  The fact that K.C. did attend a school after his expulsion, however briefly, only came to light as a result of questions I asked K.H.'s counsel during her argument.  *See* 3/14 Tr. at 62-63.

II.    Discussion

   A.    The Applicable Legal Standard

   A  party seeking a preliminary injunction "must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *see also Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994).  Where a party seeks a mandatory injunction that alters the status quo by commanding an affirmative act, the burden is even higher:  the movant must show "a clear or substantial likelihood of success on the merits, or that it will suffer extreme or very serious damage if denied preliminary relief." *D.D. v. New York City Bd. of Educ.*, 2004 WL 633222, *23 (E.D.N.Y. Mar. 30, 2004) (citing *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-35 (2d Cir. 1995); *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (3d Cir. 1985).

   In their arguments on K.H.'s motion, the parties have not focused on the distinction between a prohibitory injunction and the apparently mandatory relief of reinstatement that the plaintiff now seeks.  Because, as explained below, I conclude that K.H. has failed to show a likelihood of success on the merits that would justify even a prohibitory injunction, I necessarily conclude that she also fails to clear the higher legal hurdle the law sets in the path of an applicant seeking mandatory injunctive relief.   However, because the prospective injury at issue is common to all of K.H.'s claims, I first examine the question of irreparable injury, and then proceed on to the merits of each individual theory of liability.

10

B.    The Likelihood Of Irreparable Injury

K.H. asserts that in the absence of injunctive relief, her son will suffer irreparable injury by being deprived of appropriate schooling. There is little serious dispute between the parties as to whether K.C. is suffering irreparable injury by sitting at home rather than attending a school that can meet his heightened educational needs, and in any event I find that the record and the case law supports this aspect of K.H.'s application. *See*, *e.g.*, *D.D.*, 2004 WL 633222 at *24 (citing *A.T. v. New York State Educ. Dep't*, 1998 WL 765371, *10 (E.D.N.Y. Aug. 4, 1998); *Borough of Palmyra Bd. of Educ. v. F.C.*, 2 F. Supp.2d 637, 645 (D.N.J. 1998); *J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57, 72 (D. Conn. 1997)); *see also LIH v. New York City Bd. of Educ.*, 103 F. Supp.2d 658, 665 (E.D.N.Y. 2000) (finding high risk that disabled students would erroneously face suspension satisfied irreparable injury requirement). I recognize that the decisions in the cases cited above arise under the IDEA, which – as explained below – does not control this dispute. The case law is nevertheless applicable in this context:  although the School need not comply with the IDEA, the latter law provides K.C. with certain educational rights, and the law recognizes that the deprivation of those rights can result in irreparable harm. That harm is no less real, and no less irreparable, if it is occasioned by something other than an actionable violation of the IDEA.

While the record sufficiently demonstrates that K.C. is suffering an irreparable injury that the requested relief will ameliorate, there nevertheless remains a substantial question, at least in my mind, as to whether K.H. has demonstrated "the likelihood of irreparable injury *in the absence of* [the requested] injunction[.]" *Federal Express*, 201 F.3d at 173 (emphasis added). This is because the plaintiff has created a rather murky record with respect to both her own role

11

in depriving K.C. of the opportunity to attend the School and the availability of other educational options that would render the absence of an injunction less harmful.

First, the record suggests that if there was a way for the parties to keep K.C. successfully enrolled in the School, an evaluation by Dr. Dillon might have led them to find it. That evaluation did not take place for reasons that are in dispute. The School relies on hearsay to blame K.H. for interfering with the evaluation; K.H. relies on her own testimony to support the proposition that Dr. Dillon decided against the evaluation after speaking with her and learning that another psychiatrist was treating K.C. The latter makes less sense than the former, and K.H.'s testimony – filled with internal inconsistencies, often unresponsive to questions by the court and counsel, and plainly driven by an agenda to obtain the relief at issue here – is scarcely more reliable than the hearsay it contradicts. In a procedural posture in which K.H. bears the burden of persuasion, *see Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005 ) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)), her failure to produce a clearer record on this score is troubling.

Second, after the School expelled K.C., he did attend another school, and even after he was suspended from that school his mother was meeting with school district officials in an attempt to find another. There was thus at least a possibility at the end of the evidentiary hearing that, whatever the merits of the School's decision to expel K.C., the expulsion itself would not be the source of irreparable harm, and as set forth above, K.H. has done nothing to demonstrate that the possibility has failed to materialize. As it is K.H.'s burden to demonstrate a likelihood of irreparable harm in the absence of the requested injunctive relief, her failure to present a clearer record on this score as well would render it difficult to recommend granting her motion even if she had succeeded in showing a likelihood of success on the merits. Given the School's

acknowledgment that the March 17 meeting was not likely to result in K.C.'s immediate

placement in another school, 3/14 Tr. at 107, I would hesitate to rely solely on K.H.'s failure in

this regard as the basis for recommending a finding that there is no likelihood of irreparable

harm.  As discussed below, however, there is no need to resolve that matter because the record

plainly shows K.H. failed to carry her burden on the merits of her claims.

      C.    <u>The ADA Claim</u>

The ADA provides:  "No individual shall be discriminated against on the basis of

disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns,

leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  The

parties agree that the School is subject to the ADA's requirements.  *See id*. § 12181(7)(J).  As a

result, K.H. may succeed on her ADA claim if she can demonstrate four essential elements:  (1)

that K.C. was disabled within the meaning of the ADA; (2) that the School had notice of K.C.'s

disability; (3) that K.C. could participate in and benefit from the school's educational program

with a reasonable accommodation of his disability; and (4) the School refused to make such an

accommodation.  *See id*. § 12112(b)(5)(A); *Mitchell v. Washingtonville Central School Dist.*,

190 F.3d 1, 6 (2d Cir. 1999); *Fink v. New York City Department of Personnel*, 53 F.3d 656, 567

(2d Cir. 1995).  Even if K.H. can establish those elements and thereby prove a *prima facie* case

under the ADA, the School may defeat her claim if it can establish that the accommodation K.C.

needs would cause it to suffer undue hardship.  *See Borkowski v. Valley Central School Dist.*, 63

F.3d 131, 138 (2d Cir. 1995).

The School does not dispute that K.C. is disabled within the meaning of the ADA or that

it had notice of that fact.  It does dispute that it has denied him a reasonable accommodation, or

alternatively asserts that any further accommodation would cause undue hardship. On this latter issue I conclude that K.H. has failed to demonstrate a likelihood of success on the merits.

The only reasonable accommodations that K.H. identifies is to have Dr. Aronowitz meet with school officials to discuss how to handle K.C.'s disciplinary problems. *See* 2/28 Tr. at 24, 48-49. Having heard testimony from Dr. Aronowitz, however, it is clear that his only proposal was to talk things over; he did not have any particular plan of action or specific accommodation in mind. *See* 3/14 Tr. at 46; *see also* 2/28 Tr. at 47-49 (testimony by K.H. that she asked the School to "work out some plan" for K.C. and that Dr. Aronowitz told someone at the School that "they needed to have more patience and more tolerance and work with him to accommodate – more flexibility, less rigidity" and that "he was willing to do that and work with the school"). Moreover, after seeing K.C. following his suspension, Dr. Aronowitz did not submit any report in response to the School's request for an evaluation of K.C. *See* 3/14 Tr. at 36.

Thus, to the extent that the involvement of Dr. Aronowitz in K.C.'s behavior management is viewed as a potential "reasonable accommodation," the amorphous and *ad hoc* nature of that involvement leads me to conclude that K.H. is not likely to succeed in establishing that the accommodation would make it possible for K.C. to continue to attend the School and benefit from its educational program. With the precise contours of the proposed accommodation so difficult to pin down, the proposition that it will succeed where the school's other methods have failed is dubious at best. While I would much prefer to see the School give Dr. Aronowitz – and more importantly, give K.C. – a chance for the proposed accommodation to succeed, that preference is immaterial: I can only recommend relief consistent with that preference if I can conclude that the court will likely find the School's intransigence to violate the ADA. I cannot do so.

There are other ways of viewing the record, but none is of greater service to K.H.'s cause. The record is amenable to the interpretation that – as the School argues – it *did* offer a reasonable accommodation by endeavoring to have Dr. Dillon evaluate K.C. 2/28 Tr. at 91 (statement by counsel that having K.C. evaluated was part of the School's accommodation in addition to making "changes to his program" and "outreach to the parent," though the record on the substance of the latter two accommodations is entirely lacking); *see also* 3/14 Tr. at 9 (testimony by Wishnew that K.C.'s continued attendance at the School "was dependent" on K.H. having him evaluated). To the extent that the proposed evaluation might have been an accommodation, there is the same problem that affects the accommodation proposed by Aronowitz: there is nothing to suggest that it would actually result in K.C. being able to continue reaping the benefits of the School's educational program. Moreover, whether the decision to cancel Dr. Dillon's evaluation was attributable to the psychiatrist himself or to K.H.'s interference, there is nothing in the record to suggest that the School, having attempted to provide the evaluation as the precursor to a possible accommodation, did anything to keep it from going forward. Thus, even viewing the proposal to have Dr. Dillon evaluate K.C. as an accommodation for purposes of the ADA, the School did not refuse to provide it.

There is of course the possibility that the School could do something more for K.C. than simply have a psychiatrist – whether Dr. Dillon or Dr. Aronowitz – evaluate him further and be available for future discussions. For example, it could have provided some form of individual therapy for K.C. geared to controlling his behavior. But to the extent that K.H. implicitly suggests that the School should have provided such an accommodation, I conclude that it would be unreasonable to expect the School to do so, or to read such a requirement into the ADA under

the circumstances of this case.[5]  The School does not normally provide such therapy, and apparently is neither equipped nor qualified to do so.  *See* 3/14 Tr. at 29.  Indeed, the School takes affirmative steps to avoid being in this position, despite having a program for students with heightened educational needs, by attempting to screen out students with "serious emotional or disciplinary problems" in its admissions process.  DE 1 (attachment from School's Internet web site); *see also* 3/14 Tr. at 22 (testimony by Wishnew that the School does not have other students who exhibit the same type of behavior as K.C.; "this was something that was very difficult for us to handle and deal with").  Requiring the School to provide the kind of therapy that K.C. may need to adapt to its disciplinary environment would thus be an undue hardship that would defeat K.H.'s ADA claim.

For similar reasons, K.H. cannot expect the School to accommodate K.C.'s disability by excusing his disciplinary problems.  *See Bercovitch v. Baldwin School Inc*., 133 F.3d 141, 152 (1st Cir. 1998) (finding that school was not required to exempt student with ADHD from the normal operation of its disciplinary code); *see also* 42 U.S.C. § 12182(b)(2)(A)(ii) (exempting covered entities from providing accommodations that "would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations").  Indeed, to the extent that K.H. would propose as a reasonable accommodation her desire to have the School give K.C. the benefit of "more patience[,] more tolerance[,] ... more flexibility, [and] less rigidity[,]" 2/28 Tr. at 48, such an accommodation could result in K.C. engaging in behavior that

---

[5]  K.H. testified that, prior to the incident on January 3, 2006, she asked school officials "to provide one-on-one help for [K.C.] ... [and] work with him more intensely" and that the officials responded that "they were working on that, that they would."  2/28 Tr. at 47.  I see no other evidence in the record suggesting that the School actually provided such one-on-one help.  To the extent that K.H. made such a request and would now describe it as a reasonable accommodation that the school refused to provide, I make no factual findings in that regard because I conclude that the School was not required to provide such help under the ADA.

would adversely affect other students at the School. The record plainly demonstrates the risk that K.C.'s problems may lead him to act out violently with schoolmates and teachers, 3/14 Tr. at 51, as well as a strong suggestion that that has already happened. *See id.* at 8. Requiring the School to tolerate such a risk would be a hardship that the ADA does not impose.[6] As a result, I cannot conclude that K.H. is likely to succeed on the merits of her claim under the ADA.

D.     The Rehabilitation Act Claim

K.H.'s claim under the Rehabilitation Act is no stronger than her claim under the ADA, and possibly somewhat weaker. The parties agree that the substantive standards for the former claim are essentially the same as for the latter, but they disagree as to whether the School is subject to the requirement of the Rehabilitation Act at all.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794. The School contends that it is free from regulation under this provision because it does not receive Federal financial assistance within the meaning of the statute. Consideration of this threshold issue requires both an explication of the statutory

_____

[6] Even if the ADA did require the School to provide an accommodation that might place others at risk, such a theory of liability would undermine the claim for preliminary injunctive relief. Where the request for a preliminary injunction "implicates public interests, 'a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success warrants injunctive relief.'" *R.M. v. Vernon Bd. of Educ.*, 208 F. Supp.2d 216, 225 (D. Conn. 2002) (quoting *Time Warner Cable of New York City v. Bloomberg, L.P.*, 118 F.3d 917, 929 (2d Cir. 1997)) (denying preliminary injunction on IDEA claim where there was significant evidence that the student was "a danger to himself and others and requires strict supervision at all times" and that the plaintiffs "failed to show" how their proposed relief "would ensure the safety of [the student] and those in the community").

phrase and some additional discussion of the evidence in the record regarding the School's finances.

Courts interpreting the Rehabilitation Act look to the actual receipt of federal financial assistance; they do not apply the statute to an institution solely on the ground that it indirectly benefits from the distribution of such aid. The rationale is that the Rehabilitation Act creates, in essence, a contractual relationship in which the recipient of financial assistance agrees, in exchange for the assistance, to conform its conduct to certain standards. Accordingly, only an entity that is in a position to accept or reject such obligations by accepting or rejecting the financial assistance is deemed covered by the statute. *See Alfano v. Brideport Airport Services, Inc.*, 373 F. Supp.2d 1, 5 (D. Conn. 2005); *O'Keefe v. Niagara Mohawk Power Corp.*, 714 F.Supp. 622, 630 (N.D.N.Y. 1989) (citing *U.S. Dep't Of Trasnp. V. Paralyzed Veterans*, 477 U.S. 597, 605 (1986)); *see also* 34 C.F.R. § 140.3(h)(1)-(3) (defining federal financial assistance).

K.H. cites several facts that she believes brings the School within the ambit of the Rehabilitation Act. For example, she notes that the School has occasionally accepted tuition payments on behalf of particular students directly from their public school districts. *See* DE 1 at 2. Even assuming that such funds are traceable to federal assistance programs, the School contests that such payments suffice: it contends that it is the parent or guardian who is responsible for tuition, and that the School's agreement as a matter of courtesy to accept the payment directly from a governmental entity that would otherwise be reimbursing the parent or guardian does not carry with it an agreement to accept federal restrictions on its conduct. *See* DE 4 at 3-4. This argument is compelling. *See Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996) (finding that the Rehabilitation Act was not intended to cover those receiving compensation for services rendered).

Less persuasive, however, is the School's position on another source of funds. The School acknowledges that in each of the last several school years, it has accepted approximately $1,000 from public school districts distributed pursuant to federal law (20 U.S.C. §§ 6602, 6651, 7103). *See* DE 3 ¶ 8. The School further acknowledges that at the time the instant litigation commenced, it had an application pending to receive similar funds for the 2005-2006 school year, but notes that it later withdrew that application on the advice of its counsel in the hope that by doing so it would ensure that it is not held to account under the Rehabilitation Act. *See* 2/28 Tr. at 82, 85-86; 3/14 Tr. at 108-109. The School contends that even if the withdrawal of its application does not defeat K.H.'s reliance on the statute, the *de minimis* nature of the funds does. *See* 3/14 Tr. at 108-109.[7] Neither argument is persuasive, as explained below.

First, at the time of K.C.'s expulsion, the School's application for funding was pending – meaning that at that time, it was willing both to accept the funds and to satisfy any conditions for obtaining them. The contract analogy that courts have relied on in other contexts suggests a number of reasons to conclude that the School's later attempt to escape potential liability for violating the Rehabilitation Act by giving up its application should not succeed notwithstanding the fact that the "contract" was never finalized.

Second, I can find no support in the law for the *de minimis* exception the School advocates. The sole case it cites in this regard involved "the receipt of some small amount of material aid *purchased by a third party with federal funds*." *Marshall v. Sisters of the Holy Family of Nazareth*, 399 F. Supp.2d 597, 603 (E.D. Pa. 2005) (emphasis added) (cited in DE 4 at 18). The receipt of such a benefit fails to trigger the Rehabilitation Act not because it is small,

---

[7] The School has withdrawn a third argument to the effect that the Rehabilitation Act is inapplicable because its requirements only govern the specific programs and activities that receive federal funds. *See* 3/14 Tr. at 118-120 (withdrawing argument made in DE 4 at 22).

but because it is an indirect benefit of the provision of federal assistance; in other words, the "material aid" the school received was not conveyed pursuant to the "contract" between the grantor and the grantee of the federal funds. As a result, regardless of the steps it may have taken since K.C.'s expulsion to escape the bonds of the Rehabilitation Act, at the time of the conduct at issue in this litigation the School was covered by that statute.

The elements of a claim under the Rehabilitation Act are "identical" to those supporting a claim under the ADA, with one important exception: "under the Rehabilitation Act, the defendant must have discriminated against the plaintiff 'solely' because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination." *Spychalsky v. Sullivan*, 2003 WL 22071602, at *6 (E.D.N.Y. Aug. 29, 2003) (citing *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999)); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000). Because I conclude that K.H. is not likely to prevail on the merits of her ADA claim, I must therefore reach the same conclusion with respect to her claim under the Rehabilitation Act.

One aspect of K.H.'s claim under the Rehabilitation Act that is distinct from her claim under the ADA is her contention that the School deprived K.C. of due process in the manner by which it expelled him. *See* 3/14 Tr. at 101. The School concedes that the Rehabilitation Act does confer some "unspecific" procedural rights, but argues that its procedures in expelling K.C. were sufficient because Wishnew met with K.C. and K.H., presented the "charges" to them, and gave them an opportunity to discuss the matter. 2/28 Tr. at 87. K.H. replies that those procedures are inadequate because they fail to meet the requirements of the following regulation:

> A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of

handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure. Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act is one means of meeting this requirement.

34 C.F.R. § 104.36.

I conclude that K.H.'s reliance on the regulation as the source of specific procedural requirements is misplaced. By its own terms, the regulation on which she relies does not apply to the School, which does not operate a "public" educational program. The provision is part of a series of regulations, promulgated to implement the Rehabilitation Act, that allow a public entity to satisfy its obligation to provide a free education to qualified handicapped persons by delegating the task to a private facility while maintaining responsibility for compliance with the statute. *See* 34 C.F.R. § 104.33(3); *see also J.D. v. Pawlet School District*, 224 F.3d 60, 70 (2d Cir. 2000). Thus, if K.C. had been attending the School as a result of placement there by a public school district that had contracted with the School to fulfill the district's obligations under the Rehabilitation Act, K.H.'s procedural argument might be stronger, at least with respect to a claim against the school district. Under the circumstances of this case, however, the specific procedures listed in the cited regulation can represent nothing more than sound policy; they do not comprise a legally enforceable procedural requirement. If there is any other authority to support the proposition that the Rehabilitation Act required the School to do more than it did in this case, K.H. has not brought it to my attention. Accordingly, I cannot conclude that K.H. is likely to prevail on the merits of her claim under the Rehabilitation Act.

E.    The IDEA Claim

The stated purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  In furtherance of that legislative goal, the IDEA requires educators and parents of a disabled student to work together to develop an Individualized Education Program ("IEP") for each year of the child's education.  *See J.S. v. Attica Central Schools*, 2006 WL 581187, at *2 (N.D.N.Y. March 8, 2006) (citing *Polera v. Bd. of Educ. of the Newburgh Sch. Dis.*, 288 F.3d 478, 482 (2d Cir. 2002).  A parent challenging the implementation of an IEP has certain due process rights under the statute, including an "impartial due process hearing" and an appeal.  20 U.S.C. § 1415(f), (g).

K.H. vigorously decries the School's failure to provide her son and herself their due process rights under the IDEA when it expelled K.C.  The School concedes that the IDEA has more specific due process requirements than does the Rehabilitation Act, but argues that the IDEA is wholly inapposite to this case.  *See* 2/28 Tr. at 81.  I agree.

The IDEA regulates public agencies only; to the extent it permits such public agencies to satisfy their obligations through the placement of students in private institutions such as the School, parents of disabled students must nevertheless look to the public agency for the enforcement of rights under the statute, not the private school.  The public agency can fulfill its obligations in that regard through contractual arrangements with the private institution, but that does not create a right of action by the student or parent against the private institution under the IDEA (although if there is such a contractual arrangement, the student or parent may have standing to enforce it).  *See St. Johnsbury Academy v. D.H.*, 240 F.2d 163, 169, 171-173 (2d Cir.

2001). The applicable case law thus plainly compels the conclusion that K.H. is not likely to succeed on the merits of her claim under the IDEA.

III.    <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the court deny plaintiff K.H.'s application for a preliminary injunction.

IV.    <u>Objections</u>

This Report and Recommendation will be filed electronically on the court's ECF system and is deemed served on all parties as of the date of such filing. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to me within 10 days of the date of this order. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.2d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
       March 29, 2006

                                                    /s/ James Orenstein
                                                    JAMES ORENSTEIN
                                                    U.S. Magistrate Judge